**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-1250**

---

ARCHER DANIELS MIDLAND COMPANY,

Plaintiff - Appellee,

versus

BRUNSWICK COUNTY, NORTH CAROLINA,

Defendant - Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, Senior District Judge. (CA-02-96-7-F)

---

Argued: October 26, 2004      Decided: March 15, 2005

---

Before WIDENER, GREGORY, and SHEDD, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Gregory wrote the majority opinion. Judge Widener wrote a separate concurring opinion. Judge Shedd wrote a dissenting opinion.

---

**ARGUED:** John Joseph Butler, PARKER, POE, ADAMS & BERNSTEIN, Raleigh, North Carolina, for Appellant. Larry Bruce Sitton, SMITH MOORE, L.L.P., Greensboro, North Carolina, for Appellee. **ON BRIEF:** Charles C. Meeker, PARKER, POE, ADAMS & BERNSTEIN, Raleigh, North Carolina, for Appellant. Manning A. Connors, SMITH MOORE, L.L.P., Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

GREGORY, Circuit Judge:

This diversity action concerns a long-term contract for the sale of water between Archer Daniels Midland Company ("ADM") and Brunswick County, North Carolina ("Brunswick County" or "the County"). In 1999 the County increased its rates as part of a plan to pay off debt incurred from efforts to expand the water system. ADM objected to the rates, then sued the County in the U.S. District Court for the Eastern District of North Carolina. The district court granted summary judgment to ADM for liability and damages and entered a judgment in the amount of $357,758 in compensatory damages and $58,264.64 in prejudgment interest. Brunswick County now appeals the court's rulings against it. We affirm the ruling of the district court.

I.

To reveal the full context of the issues involved we quickly revisit the parties' pre-contractual course of dealing, the express text of the contract, and the post-contractual course of performance.

A.  Pfizer and Brunswick County

In the early 1970s, Brunswick County had no water system. Pfizer, Inc. ("Pfizer") wished to run a citric acid manufacturing plant that would need large amounts of potable water. The parties negotiated a deal in 1973 by which Pfizer would build its plant in

2

Southport, a town in Brunswick County, and defray significantly the water system's costs by guaranteeing that its plant would be a large consumer of the County's water. The County, in turn, built the water system and offered advantageous pricing for the water.

It appears from the record that the new water system quickly became insufficient and that, among other problems, the system's inadequacies caused difficulties at Pfizer's plant. As a result, in 1979 or 1980 the County decided to expand the water system and distribution facility. It secured Pfizer's blessing by amending the original contract and approved a bond referendum to pay for the expansion. The parties call the first agreement and its amendment Phase I and Phase IA, respectively.

Soon afterwards the County began yet another expansion of its water system. This expansion -- called Phase II -- was completed in 1983 and was also funded with bonds. Once done, the County began to charge Pfizer rates that included costs associated with Phase II. Moreover, at some unknown point the County began to mix its accounts by paying an annual subsidy from its general (non-water system) funds in order to satisfy the debt service for Phase II. These actions led to a 1984 lawsuit quite similar to the one now before us: Pfizer sued the County for including Phase II costs in its rate calculations. On October 7, 1986, Pfizer and the County settled this lawsuit by signing the contract before us ("the contract"), which is effective until the year 2020.

3

## B.  The 1986 Contract

The contract establishes what should be a seamless and straightforward pricing structure.  First, ¶ 5 of the contract states that the County must always charge Pfizer the "Lowest Commercial Rate" ("LCR") in effect at the time of the water's delivery.  J.A. 21.  The qualifier "commercial" is actually misleading, since ¶ 4(b) clearly defines LCR as "the lowest price charged by the County to any user purchasing water for any purpose whatsoever."  J.A. 20.

Several conditional ceilings to the LCR exist in ¶ 5, but the only two now relevant are ¶¶ 5(d) and 5(f).[1]  Paragraph 5(d) establishes that the rate charged per 1,000 gallons will not exceed $1.50 times the Producer Price Index for Finished Goods ("PPI") established "from May 1, 1985 to May 1 of the calendar year in which the rate for the forthcoming fiscal year is being determined."  J.A. 22.  Paragraph 5(f) offers something like an exception to ¶ 5(d).  The bulk of this dispute concerns whether ¶ 5(f) applies, and its meaning if it does.  We thus quote ¶5(f) at length:

> Should the maximum charges as specified herein be
> insufficient to meet the Net Operating and Maintenance
> Expense for any fiscal year plus debt service... relating
> only to Phases I and IA of the Water System (specifically

---

[1]Paragraphs 5(a) through 5(c) are inapplicable after 1988. Paragraph 5(e) provides a volume-based discount to ¶ 5(d).  The district court granted summary judgment to the County on the point that ¶ 5(e) did not apply, and ADM did not appeal.

4

excluding debt service. . . relating to Phase II and debt service relating to any subsequent expansion of the Water System), the charges for all customers for the year in question shall be increased on an equal percentage basis by the County (including increasing the maximum charges to Pfizer beyond that otherwise authorized by this Agreement) in order to raise sufficient funds to cover both such Net Operating and Maintenance Expense and Phase I and Phase IA debt service.

J.A. 22. Paragraph 5(f) is plainly structured as an "if, then" conditional. If (and only if) "the maximum charges as specified herein" are "insufficient" to meet the County's "Net Operating and Maintenance Expense" ("NOME") plus debt service only on Phases I and IA, then the charges for all customers "shall be increased on an equal percentage basis." Id. (emphasis added). Paragraph 4(c) defines NOME in detail:

> Net Operating and Maintenance Expense" shall mean the cost of raw water and other direct expenses associated with the operation and maintenance of the County's Water System. The following are examples of such items: 1. Salaries 2. FICA taxes 3. Group Insurance (Medical) 4. Payments to retirement fund 5. Professional service 6. Postage 7. Telephone 8. Utilities 9. Travel and Training 10. Equipment repairs 11. Vehicle repairs 12. Equipment rental 13. Chemicals 14. Automotive supplies 15. Department supplies 16. Laboratory supplies 17. Uniforms 18. Contracted services 19. Dues and subscriptions 20. Insurance 21. Capital equipment used to operate or maintain the Water System, but excluding any equipment to expand the County's Water System. Excluded from Net Operating Expense are all (1) debt service obligations, (ii) all expenses which are reimbursed by special fees, such as tap on fees, (iii) any funding of reserves for other than operation and maintenance items; and (iv) for the purposes of interpreting 4(c)(21) above, any costs of capital investment to expand or extend the Water System.

J.A. 20-21.

5

In sum, the contractual text protects <u>Pfizer</u> by limiting the rates the County can charge it to an amount that is (1) never more than any other customer is charged, (2) unless certain conditions are met, no more than (for our purposes) the PPI-adjusted price of ¶ 5(d), and (3) in any event, never more than a rate that would be "sufficient" to meet the "cost of raw water and other direct expenses associated with the operation and maintenance of the County's Water System" when coupled with other customers' charges (<u>see</u> <u>infra</u> Part III.A). The <u>County</u>, however, may (1) set the LCR at any amount up to the ¶ 5(d) ceiling it chooses. Additionally, (2) by requiring Pfizer to contribute "on an equal percentage basis," ¶ 5(f) aids the County in obtaining an amount equal to the water system's NOME.

C. The Parties' Pre-Litigation Course of Performance

In 1990, Pfizer sold its manufacturing plant to ADM, making ADM a successor in interest to the contract. As the district court found, we have no reason to believe that the contractual relationship between the County and Pfizer/ADM was anything but harmonious after the contract was signed until the 1999 rate increases. Throughout this time, Pfizer and ADM purchased immense amounts of water from the County; in fact, ADM notes that it is the County's largest water customer.

The undisputed evidence before the district court shows that in late 1997 and 1998 the County set a goal of ending its subsidy

6

of the water system, particularly the system's Phase II debt.[2] Among other evidence, Lee Smith, the County's Director of Public Utilities, testified at a deposition that to achieve this goal the County set in place a five-year plan to pay off twenty percent of the debt annually by increasing charges systemwide. Smith's deposition included the following exchange:

> Q:   Let me ask you, in referring to [the Contract], and specifically paragraph 5, to explain how the County has calculated the rate for water that has been charged to ADM since January 1999.
>
> A:   Okay, the way the rate was calculated beginning that year was that staff was given a charge to have the -- to establish a rate that would eventually get the water system on a paying basis, and that was developed into a five-year plan, and that plan was -- in that plan was a rate developed for industrial customers, which ADM is one of. . . .

J.A. 250; see also J.A. 253. Under this "five year plan," rather than calculating the rate in the progression that the contract anticipates, the County worked backwards from the goal of making the water system self-sufficient.

Mr. Smith also testified, and no other evidence contradicts, that so far as he knows, prior to this litigation the County had never calculated a ¶ 5(f) rate in the manner which the County now wishes for us to calculate it. See J.A. 275-77, 314. Rather, as the following excerpt from Mr. Smith's deposition indicates, the

---

[2]In 1993 the revenue bonds associated Phases I and IA were retired, thus dissolving those debt-service obligations.

only rate calculations done are reflected in a number of worksheets:

> Q: Before that [January 1, 1999] rate was put into place, were there any calculations done to see if that rate complied with the agreement?
> A: The process was done through the finance department as an internal process. She [Lithia Brooks] –- it is referred to in [. . . the worksheets[3]]. . . .
> Q: Are those calculations that were done at some point to determine the rate of water charged to ADM?
> A: Those were the –- that process was conducted by finance, and that was –- those were the people that conducted that particular analysis.

J.A. 254-56. After the 1999 rate increases began, in response to ADM's questions, the County's counsel sent a June 29, 1999 letter which enclosed "a summary of the calculations used by the County to arrive at the potable water rate. . . ." J.A. 574-76. The enclosures were worksheets for fiscal years 1998-99 and 1999-00.[4] A later letter from the County's attorney to ADM explains that the method used in these worksheets is consistent with the County's prior rate-setting methods. Specifically, it states:

> Information should have been sent to your office that supports the County's calculation of the water rate. This method was the same method that was used to

_____

[3]The specific worksheets referred to here are found at J.A. 407, 411-413. The method used in the worksheets generated by the County's finance department are materially identical.

[4]The 1998-99 worksheet was called "Brunswick County Water Rate Analysis FY 98-99 Approved Budget." The 1999-00 worksheet was entitled "Brunswick County Water Rate Analysis FY 99-00 Revised Recommended Budget." J.A. 575-76. Subsequent exhibits included in the record (as "Exhibit 12" and "Exhibit 13" at J.A. 407-13) included the same 1998-99 worksheet and utilized the materially same method for later fiscal years.

calculate the rate set in 1996.  The same calculation method that produced the $1.1815 rate (that ADM is currently paying) [sic: $1.815] produced the $1.98 rate. Are we to assume that since there was no objection to the method used to set the rate at that time, that there will be no objection to its being set the same way this time?

J.A. 580.

Despite the County's current protests to the contrary, these worksheets are important insights into the County's pre-litigation rate-setting methods.  As the district court found, the worksheets revealed that the County would:  (1) calculate the PPI rate; (2) calculate the rate necessary to cover NOME, then (3) compare the PPI rate with the NOME rate, and only charge above the PPI rate if (1) is less than (2).  See J.A. at 664.  To calculate the rate necessary to cover NOME, the worksheets begin with the water-system budget -- and decidedly not any other expenses, like the large capital-projects expenses accounted for elsewhere that the County would now have us include -- as NOME's foundation.[5]  They then deduct from the Water System budget all debt service[6] and "special fees" (including "tap" and "LCFW&SA" fees and, beginning in 1999-00, "capacity," "availability," and "acreage" fees).[7]  The

---

[5]The 1998-99 water system budget was $13.83 million, while the 1999-00 water system budget was $12.86 million.

[6]The 1998-99 worksheet adds back in $421,000 of some other "debt service" (which, according to the district court, is actually a line item in the water-system budget for capital leases for water system maintenance equipment. See J.A. 667).

[7]In 1998-99, the deduction for "special fees" totaled $1.16 million and reflected only "tap on" and "LCFWRA" fees.  In fiscal year

9

worksheets then divide this resulting amount by what appears to be the total gallons of water sold to arrive at an "approved water rate." See J.A. 407-11, 575-76.[8] This "approved" rate was, to the County, the maximum rate it could charge ADM.

The County now attempts to discredit its earlier clear representations to ADM that the worksheets were "used by the County to arrive at the potable water rate," J.A. 574; "support[] the County's calculation of the water rate," J.A. 580; were "the same method that was used to calculate the rate set in 1996[,]" id., and are "[t]he same calculation method that produced the [] rate (that ADM is currently paying). . . ." Id.

The County's offerings in support of this assertion, however, are less than meager. It can submit only the testimony of its Director of Fiscal Operations, Lithia E. Brooks, who now claims that the internal worksheets were, while produced at her direction, never actually used to calculate the ¶ 5(f) rate. E.g., J.A. 214-17. Notably, however, Brooks echoes Smith in failing to offer any positive method for how rates actually were charged. Thus, in

_____

1999-00 and subsequent years, however, the County began to charge its customers other "capacity," "availability," and "acreage" fees -- in addition to the per-thousand-gallon charge. These were also each deducted by the County as "special fees." J.A. 407-11, 576. The worksheets for fiscal years 1999-00 and after also then add in to the water system budget approximately $1.6 million annually for depreciation of capital assets. Id.

[8]In 1998-99 the approved rate was $2.51 per thousand gallons. In 1999-00, it was $1.979 per thousand gallons.

10

denying that the worksheets reflected the County's pre-litigation rate-setting method, the County is left in the awkward position of (1) having to admit that it never calculated ADM's water rates under the method they would now have us use and (2) offering no affirmative theory -- much less evidence -- of how its rates actually were calculated before the lawsuit.  In stark contrast, on this point ADM offers (1) clear-as-day pre-litigation admissions from the County, sent by its attorney, that the worksheet method was used before litigation and did reflect the County's rate-setting method for years before those years relevant for this lawsuit.  J.A. 572-81.  Moreover, ADM offers (2) other worksheets ordered at Ms. Brooks' behest which consistently continue the methods of the pre-litigation worksheets for the fiscal years up through 2003.  See J.A. 407-11.

On August 31, 2000 -- about seven months after it sent the last letter in support of the worksheets -- the County told ADM that it owed $191,546, the difference between the rate ADM was paying and the rate the County had charged since January 1, 1999. The County threatened to cancel ADM's water service if it did not send payment by September 21, 2000.  On September 14, 2000, ADM paid what the County said it owed under protest.

### D. The Lawsuit

ADM sued on June 21, 2002.  The thrust of ADM's case is that, because ¶ 5(f) was inapplicable, the County was unjustified in

11

charging anything more than the ¶ 5(d) rate. Specifically, ADM contends that it overpaid by $357,768 in the years now relevant to the contract.[9] Brunswick County asserted a counterclaim for the years ADM has paid less than the County's full charges, and, unlike ADM, requested a jury trial. The County's chief counter-argument is that its rates could have been justified, even had it not included the Phase II debt charges.

To support this theory, the County relies upon the report and deposition of Dr. C. W. Corssmit, Ph.D., an utilities economist who analyzed the rates from July 1, 1998 to June 30, 2001. Most relevantly, Dr. Corssmit's report teased out expenditures from the County's non-water system budgets and submitted that they were really expenditures that could have been, but were not, counted

---

[9]This includes amounts of $145,546 above the ¶ 5(d) rate for 2001, $76,686 for 2002, $105,410 for 2003, and $30,126 through October 30, 2004. J.A. 680, 728-30. The following table illustrates the rates charged ADM compared to what the ¶ 5(d) rate would have been during the relevant years:

| Fiscal Year | Paragraph 5(d) rate | Rate charged to ADM |
|-------------|---------------------|---------------------|
| 2001 | $1.97 | $2.20 |
| 2002 | $2.04 | $2.38 |
| 2003 | $1.98 | $2.80 |
| 2004 | $2.03 | $2.32 |

ADM has since only paid at a rate of $2.20 per thousand gallons (charged to it in 2001) rather than the subsequently increasing rates the County has billed.

under NOME. Having done so, the report concludes that adding these expenses would have justified the County's rates.

After discovery, ADM moved for total summary judgment. Brunswick County opposed and, in turn, moved only for partial summary judgment on the issues that (1) the statute of limitations barred any damages arising before the fiscal year beginning July 1, 2000, and (2) ¶ 5(e) (which granted a volume-based discount to the ¶ 5(d) rate) was inapplicable.

On December 2, 2003, after ordering supplemental briefing, the district court granted both parties' motions -- thus finding that the County breached and denying the County's counterclaims. Finding that the operative portions of the contract "present[] a difficult case for interpretation," J.A. 659, and that neither party submitted an entirely reasonable reading of ¶ 5(f) in litigation, the court leaned heavily on the parties' pre-lawsuit conduct as evidenced by the worksheets. The district court then ordered further supplemental briefing on damages, and the parties calculated the rates under the worksheet method. The district court also heard a request from the County to reconsider the propriety of deducting "special fees" from NOME. The court declined to alter its ruling from what it found the worksheet method to entail, and issued a final judgment on February 11, 2004, which granted ADM $357,758 in compensatory damages and $58,264.64 in prejudgment interest. The County timely appeals.

13

We review a district court's grant of summary judgment <u>de novo</u>. <u>Boss v. E.I. Dupont de Nemours & Co.</u>, 324 F.3d 761, 766 (4th Cir. 2003); <u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1126 (4th Cir. 1993). Summary judgment should be granted when no genuine issue of material fact remains unresolved and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, the judge's function is to determine whether any genuine issue of material fact remains for trial. <u>Anderson</u>, 477 at 249. Unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is proper. <u>Id.</u> at 248.

The district court properly noted that North Carolina law controls the interpretation of the contract; ¶ 14 of the contract indicates as much. However, the court then errantly noted -- albeit ultimately harmlessly -- a different summary judgment standard. Citing the North Carolina Supreme Court case of <u>Davison v. Duke University</u>, 194 S.E.2d 761, 783 (N.C. 1973) for the proposition that "[t]he interpretation of a contract is a question of law within the court's province," J.A. 653, the district court simply decided that, under North Carolina law, it was to decide the contract as a matter of law.

14

This was an oversight.  Since the suit was filed in federal court, the <u>Federal</u> Rules of Civil Procedure govern matters like whether Fed. R. Civ. P. 56(c) motions for summary judgment should be granted.  As Judge Posner has explained, under <u>Erie</u>, federal courts sitting in diversity should apply state contract law as would a court in that state because contract law is substantive; it is "concerned primarily with 'the channeling of behavior outside the courtroom.'"  <u>Coplay Cement Co. v. Willis & Paul Group</u>, 983 F.2d 1435, 1438 (7th Cir. 1993)(citations omitted).  However, federal law must govern whether a question is one of law or fact, because that is a matter "internal to the federal judicial system" involving the allocation of functions between judge and jury.  <u>Id</u>.; <u>Cunningham and Co., Inc. v. Consolidated Realty Mgmt., Inc.</u>, 803 F.2d 840, 842 (5th Cir. 1986)("The roles of judge and jury in the interpretation of contracts are set by federal law, even in diversity cases."); <u>see</u> <u>also</u> <u>Byrd v. Blue Ridge</u>, 356 U.S. 525, 538 (1958)("[T]here is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts."); <u>Atkins v. Schmutz Mfg. Co.</u>, 435 F.2d 527, 536-37 (4th Cir. 1970)(same).  In short, while we respect and apply as appropriate substantive state law, we guard jealously the independence of our internal procedural rules like summary judgment standards.

15

III.

This case turns on the interaction of a contract's express terms and the parties' course of performance under the Uniform Commercial Code ("UCC"). Section 2-208 of the UCC, adopted by North Carolina as N.C. Gen. Stat. § 25-2-208,[10] mandates that courts give some -- but not unreasonably heavy -- interpretive weight to the parties' course of performance. On this point, § 2-208 makes at least two principles plain: first, a course of performance is "relevant" to determine the "meaning of the agreement." N.C. Gen. Stat. § 25-2-208(1). Second, only when the two can <u>not</u> reasonably be read in harmony do the express terms "control" the course of performance. N.C. Gen. Stat. § 25-2-208(2).[11]

---

[10]North Carolina has adopted Article 2 of the Uniform Commercial Code. N.C. Gen. Stat. §§ 25-1-101 to 25-11-108. Because water can be measured by a flow meter, it is "movable" under Article 2, and thus the contract at issue in this suit is one for the sale of goods. <u>See</u> N.C. Gen. Stat. § 25-2-105; <u>Mulberry-Fairplains Water Ass'n v. Town of North Wilkesboro</u>, 412 S.E.2d 910, 915 (N.C. App. 1992)(contract for sale of water from town to business is sale of goods); <u>Westpoint Stevens, Inc. v. Panda-Rosemary Corp.</u>, 1999 WL 33545512 at *3 (N.C. Super. Dec 16, 1999)(finding steam to be "goods").

[11]Section 2-208 of the North Carolina Commercial Code provides in full:
(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.
(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such

We analyze the contract with these rules equally in mind with the proper summary judgment standard, and conclude that the district court correctly granted summary judgment to ADM.

### A. The Parties' Course of Performance

Given the evidence submitted in the summary judgment materials, the County cannot now convincingly contest that a course of performance did not exist. As the County correctly realizes, the letters themselves are not, standing alone, a course of performance. See Appellant's Br. at 41-42; N.C. Gen. Stat. § 25-2-208 cmt. 4 ("A single occasion of conduct does not fall within the language of this section."). Rather, the letters and worksheets are simply strong evidence -- not credibly contradicted, and almost surely admissible[12] -- regarding the course of performance

construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade
(3) Subject to the provisions of the next section [§ 25-2-209] on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

N.C. Gen. Stat. § 25-2-208.

[12]The County contends that the letters -- but, to their credit, not the worksheets -- are inadmissible under Fed. R. Evidence 408 because they were part of "compromise negotiations." Appellant's Br. at 39-40; Reply Br. at 13 n.1. We disagree. The letters were written months prior to any lawsuit and at the time they were written no reason existed to believe that any litigation would necessarily come to pass. Courts surely need not exclude all inter-party questions and discussions about a contract; the probative value of such evidence is quite high and considering discussions such as this does no harm to Rule 408's good goal of encouraging actual compromise negotiations.

17

established during the pre-litigation years. The County's failure to appreciate this distinction leads them to the errant argument that the letters cannot be a course of performance because ADM never "accepted or acquiesced in" the method proposed in the letters and worksheets without objection. Appellant's Br. at 41-43. First, ADM never disputed the method explained in the letters; it just questioned the basis for the numbers plugged into the calculations. But more fundamentally, these letters and worksheets offer the only evidence we have of the County's (previously admitted) rate-setting method throughout the years and, relatedly, ADM's continued acceptance of it. See, e.g., Water Ass'n v. Town of North Wilkesboro, 412 S.E.2d 910, 916 (N.C. App. 1992) (course of performance established, and contract modified, when town sold business water in excess of maximum contract price and amount for 15 years). Thus, not only can the County not point to one bit of evidence establishing any other rate-setting method used during the many years of voluminous water sales under the contract before 1999, but the County can show no evidence that these rates were not accepted.

The County also submits the novel suggestion that a course of performance between a successor in interest to a contract and an original party to the contract may not shed light on the intent of the original parties. See id. at 20, 36-38. This also falls short. A contractual successor stands in its predecessor's shoes

18

for both rights and responsibilities and -- at least -- a frank admission about the course of performance by an original party to the contract surely may be used against it by the successor. Were it any other way, it seems that the UCC's course of performance and waiver doctrines would be read out of existence whenever a contract for the sale of goods is assigned. Such a result would be particularly likely, and particularly unjust, in long-term contracts like this one. This cannot comport with the intent of the drafters of the UCC.

The County finally argues that a genuine issue of material fact remains as to the course of performance because Ms. Brooks claims that the County never used these methods to set rates.[13] Appellant's Br. at 38-39. This too must fail. With silence that speaks loudly, the County submits no other affirmative method in the summary judgment materials to contradict the clear statement of

_____

[13] Specifically, Ms. Brooks contends that the Utilities Department -- not the finance department, which evidently developed the worksheet -- sets the water rate. Ms. Brooks' testimony included the following exchanges:
> Q. Is [the worksheet] used in any way to assist the County in determining the water rates to be charged to customers? A. No, sir, it is not. . . . Q. How does the County calculate, then the rate that is charged to customers for water? A. That is simply based on the amount that is calculated needed to cover projected expenses for that department.

J.A. 215. Yet the head of the utilities department, Mr. Smith, plainly states that, prior to Dr. Corsmitt's post-litigation involvement in the matter, the County never interpreted ¶ 5(f) as it would now have the court do. This fruitless and circular finger-pointing simply does not create a triable issue of fact on the parties course of performance.

their attorney that the methods outlined in the worksheets were used by the County before litigation. We find it difficult to believe that any reasonable jury would weigh a bare, post-hoc denial, offered with nothing else to stand in its place, over a pre-litigation admission by a sophisticated contracting party vetted by its lawyer and subsequently bolstered by other uses. Here the County sent letters stating, among other things, that "a summary of the calculations used by the County to arrive at the potable water rate. . . ." J.A. 574 and "[t]his method was the same method that was used to calculate the rate set in 1996. The same calculation method that produced the [rate that ADM was paying at the time of the letter] produced [this] rate." J.A. 580. In sum, while ADM, as the plaintiff, assuredly bears the burden of proof on establishing a course of performance, the County has simply offered no evidence which genuinely puts into issue that the worksheets evidenced the course of performance.

B. Express Text of the Contract

Because "[t]he parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was," N.C. Gen. Stat. § 25-2-208 cmt. 1., § 25-2-208(2) commands us to construe the course of performance and express contractual text harmoniously "whenever reasonable." Thus, it follows that only when such a reading is decidedly unreasonable do the express terms

20

"control." N.C. Gen. Stat. § 25-2-208(2). The operative express terms for this contract are those which determine whether ¶ 5(f) applies: (1) "maximum charges as specified herein" and (2) "NOME." When (2) is an amount greater than (1), then ¶ 5(f) might apply. As explained below, these sections may, with one exception, reasonably be read in harmony with the parties' course of performance.

1. "Maximum charges as specified herein"

Paragraph 5(f) notes that when the "maximum charges as specified herein" are "insufficient" to cover NOME, the County shall charge all its customers equally more in order to equal NOME. J.A. 22. The worksheets consistently divide the County's NOME by all gallons of water sold by the County to establish the "calculated rate to cover operations." J.A. 575-76. Thus, the district court found that the contract's real meaning was informed by the parties' pre-litigation conduct, as evidenced in the worksheets, which was to utilize all water rates. The court did so, however, in spite of its opinion that the only "maximum charges" the contract expressly provided "herein" were ADM's charges set out in the immediately preceding paragraphs 5(a)-(e).

We attack this problem differently. As established above, the course of performance was not genuinely in dispute. Given this, under N.C. Gen. Stat. § 25-2-208(2), the proper question before the court is simply whether the express text may reasonably be read in

21

harmony with the course of performance.  It can.  The contract surely does not assume that ADM and the County contract in a vacuum.  Indeed, without other customers, many important portions of the contract are rendered meaningless:  among other references to revenue received from other users of the water system, ¶¶ 4(b) and 5 ensure that all other customers' charges must be higher than ADM's; ¶ 6 requires that the County charge all customers fairly and as low as practicable and requires that all water-system revenues (not merely ADM's) exclusively for water system purposes.[14]  This all allows at least a reasonable reading that "herein" was meant to refer to the entire contract -- and thus other customers' charges -- not merely the  immediately preceding ¶¶ 5(a)-(e).  Indeed, as notable as what the contract expressly says is what it does not but could have said if the parties meant to give "herein" such a cramped meaning:  the contract decidedly does not refer to the charges "as specified in the immediately preceding paragraphs" or "the maximum charges otherwise allowed to Pfizer."  Finally, we also note ADM's uncontested citation of an identical contract -- complete with an identical ¶ 5(f) -- the County entered into with the town of Long Beach.  J.A. 590.  This contract's existence is important because it severely undermines any notion that in

[14]Indeed, ¶ 5(f) itself requires all other rates to be increased equally to ADM's rates if they are ever increased beyond the ¶ 5(d) PPI-rate whenever the "maximum charges" are "insufficient."  It is certainly not unreasonable to read these two phrases of ¶ 5(f) in equilibrium.

22

drafting ¶ 5(f) the County relied solely on Pfizer/ADM's charges to cover NOME. Thus, as established by both the plain text and confirmed by the parties' plain course of performance, the district court was well within its rights to find as a matter of law that ¶ 5(f)'s "if" trigger -- "the maximum charges as specified herein" -- encompasses all water sold, not merely the charges of Pfizer/ADM. There simply is no factual dispute on this point for a jury to consider.

## 2. NOME

The other side of the ¶ 5(f) coin is NOME. The County challenges the district court's exclusion of three categories of expenses from NOME: (1) large capital expenses accounted for outside the water-system budget, (2) depreciation for capital expenses, and (3) certain "fees" the County began charging in 1999. The district court properly excluded all three.

Unlike it evidently did in the worksheets, the County now wishes to go back and include significant expenses from the capital projects fund in the calculation of NOME. As Ms. Brooks argues, "many significant capital expenditures for, among other things, maintaining the water system are not reported as an expenditure in the Water System Operating Fund but are instead reported as expenditures in the Capital Products Fund." J.A. 59. Yet the summary judgment materials make clear that the County utilized the water system budget -- and not other capital projects expenses

23

which the County now claims should count -- as the baseline for calculating NOME.

The contract defines NOME as "the cost of raw water and other direct expenses" of operating and maintaining -- but not expanding -- the system.  To be sure, this makes no explicit reference to the water system budget; but neither does this text make <u>unreasonable</u> a reading that the water system budget was to serve as the contract's proxy for "the cost of raw water and other direct expenses."  Following the district court's reasoning, it hardly seems that the parties, when drafting the contract, anticipated retaining an utilities economist annually to tease out "water system" expenses from areas other than that which the County previously and readily recognized were water system expenses.  Yet, since the course of performance did not include such expenses, to find that such capital expenses should be included we would have to be so sure that this was the parties' intent that it would be <u>unreasonable</u> to believe otherwise.  Surely it is not.  Thus, since the course of performance and express text can reasonably be read in harmony here, we are commanded to do so.  <u>See</u> N.C. Gen. Stat. § 25-2-208(2).

The interpretation of the fees and depreciation accounted for on the 1999-00 worksheet is a slightly tougher issue. Paragraph 4(c) states that "all expenses which are reimbursed by special fees, such as tap on fees" may not be included in the

24

definition of NOME. J.A. 21. The question is whether the additional charges the County apparently began in 1999 are thus "special fees, such as a tap on fee."

We first note that the County's consistent method as evidenced in the worksheets was to deduct all three fees from the water system budget. Indeed, in every fiscal year that these fees were charged, they were listed by the County under the category "special fees." See J.A. 407-11, 575-76. We also see that the County's own witnesses state consistently that acreage fees directly reimburse debt expenses and the capacity fees reimburse expansion expenses. Besides the fact that both of these fees directly reimburse an expense -- and are therefore "special" -- they doubly deserve exclusion from NOME because they reimburse expenses plainly impermissible under ¶ 4(c).[15] Thus, the course of performance and express text are capable of being reasonably read in harmony.

Finally, the district court found that "depreciation should not be counted towards NOME because it. . . is a fictional, rather than a "direct expense" to the water system. J.A. 666. The County challenges this ruling by arguing that depreciation is a "maintenance" expense that is especially important to include if

_____

[15]As for the "availability" fees, while we certainly presume that the County acts under in good faith, we note that (1) the contract is written in a way such that the County holds all the cards and could easily manipulate what any fee "reimburses"; and (2) prior to litigation (the period which North Carolina contract law gives heaviest weight), the County called availability fees "special" and deducted them when calculating their rates.

25

the "direct" capital maintenance expenses are not included. We again agree with the district court. Paragraph 4(c) of the contract took the time to list twenty-one examples of "direct expenses," ranging from FICA taxes to postage to laboratory supplies to uniforms. Given this level of detail for such comparatively minuscule items, it is <u>un</u>reasonable to believe that an expense as enormous as depreciation -- a $1.6 million annual entry on the worksheets -- was left off the list of "direct expense" examples by accident. Thus, consistent with the UCC's commands, the district court was correct here to allow the "express text" of the contract "control" the parties' course of performance. <u>See</u> N.C. Gen. Stat. § 25-2-208(2).

IV.

For no shortage of reasons, a court "faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation." <u>World-Wide Rights Ltd. V. Combe Inc.</u>, 955 F.2d 242, 245 (4th Cir. 1992). Here this is so because a court must hold in equipoise a proper respect for the express text and the UCC's practical command to allow the parties' conduct to aid in defining the text all while determining whether any genuine issues of material fact remain and refraining from deciding disputed facts.

26

The district court completed this difficult task acceptably. No genuine dispute existed regarding the County's pre-litigation rate-setting method, and thus the parties' course of performance was clear enough. The district court properly read the express text of the contract and the course of performance in harmony when it was reasonable to do so, but when, on the issue of depreciation, such a reading was unreasonable, it correctly allowed the express text to control. Thus, the district court's judgment is

AFFIRMED.

WIDENER, Circuit Judge, concurring:

I concur in Judge Gregory's majority opinion. I should add that I would affirm on the opinion of the district court.

SHEDD, Circuit Judge, dissenting:

I respectfully dissent. The dispute between the parties should be governed by the unambiguous language of the contract and not, as the majority incorrectly rules, by the parties' so-called course of performance.

The relevant contractual language provides:

5. The County will charge [ADM] for water actually delivered to [ADM] . . . , and [ADM] will pay for such water, at the Lowest Commercial Rate in effect at the time of such deliveries <u>provided</u>, <u>however</u>, that in no event shall such charge exceed the following amounts:

. . .

(d) For fiscal years subsequent . . . to 1988, an amount per 1,000 gallons not to exceed $1.50 times the ratio of the change in the PPI [Producer Price Index] . . . .

(f) Should the maximum charges as specified herein be insufficient to meet the Net Operating and Maintenance Expense [NOME] for any fiscal year . . . , the charges for all customers for the year in question shall be increased on an equal percentage basis by the County (including increasing the maximum charges to [ADM] beyond that otherwise authorized by this Agreement) in order to raise sufficient funds to cover . . . such [NOME].[1]

The parties agree that ADM must pay either the amount described in section 5(d), which is the PPI rate, or the amount described in section 5(f), which is the NOME rate. The parties, of course, disagree as to which of these two rates applies.

---

[1]Section 5(f) also includes language allowing the addition of debt service expenses for Phase I and Phase IA into the calculation. These debt service obligations were fulfilled by 1993, so they are not relevant to this case.

29

To determine which rate applies, we must first turn to the express terms of the contract. Under North Carolina law, "the most fundamental principle of contract construction [is] that the courts must give effect to the plain and unambiguous language of a contract." Johnston County v. R.N. Rouse & Co., 414 S.E.2d 30, 34 (N.C. 1992). If the language of a contract is unambiguous, the intention of the parties must be inferred from the words of the contract. Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996). Under such circumstances, the "court's only duty is to determine the legal effect of the language used and to enforce the agreement as written." Atlantic & E. Carolina Ry. Co. v. Southern Outdoor Adver., Inc., 501 S.E.2d 87, 90 (N.C. Ct. App. 1998). A contract is not ambiguous merely because the parties differ on how to interpret its terms. Walton, 467 S.E.2d at 412. Unambiguous contracts are interpreted by the court as a matter of law. First-Citizens Bank & Trust Co. v. 4325 Park Rd. Assocs., 515 S.E.2d 51, 54 (N.C. Ct. App. 1999); World-Wide Rights Ltd. Partnership v. Combe, Inc., 955 F.2d 242, 245 (4th Cir. 1992).

Although the relevant contractual provisions require careful reading and cross-referencing, they are nonetheless unambiguous. The PPI rate in section 5(d) -- an indexed rate that is not in dispute -- applies unless "the maximum charges as specified" in section 5 of the contract are "insufficient to meet the [NOME] for any fiscal year." Section 5(f). If the "maximum charge" ADM would

30

be required to pay in a given year for its water consumption based on the PPI rate[2] is "insufficient to meet" the qualifying NOME expenses allowed under the contract, then the County may charge ADM the higher NOME rate under section 5(f).[3]

The qualifying NOME expenses are clearly defined in section 4(c) of the contract.  They include direct expenses for salaries, postage, utilities, uniforms, insurance, chemicals, laboratory supplies, training and travel, and many other typical expenses incurred in operating a water system.

The parties dispute two categories of expenses under the definition of NOME.  The first disputed provision allows the County to add into NOME direct expenses for "[c]apital equipment used to operate or maintain the Water System." Section 4(c)(21).  The County presented evidence of such expenses in the relevant years, but the district court precluded these amounts from the calculation of NOME.  Because the unambiguous language of the contract clearly allows the County to include these expenses in calculating NOME, the district court's exclusion of them was erroneous.  The second disputed provision states that "all expenses which are reimbursed

[2]There are several "maximum charges" listed in section 5, but, based on the particular facts of the case, the only "maximum charge" specified in section 5 that could be used to make this necessary calculation under section 5(f) is the PPI rate under section 5(d).

[3]ADM argues that "maximum charges" means all charges paid by all customers.  There is no support for this interpretation based on the plain terms of the contract.

31

by special fees, such as tap on fees" shall be excluded from NOME. Section 4(c)(21)(ii) (emphasis added). The County, for example, charges each customer a tap-on fee when it physically connects that customer to the water system. This fee pays for the labor and plumbing supplies required to make the connection. Because the customer is required to reimburse the County for these particular expenses by paying the fee, the County in effect incurs no net expense. Allowing the County to add its tap-on expenses to NOME when they have already been directly reimbursed by the customer would improperly inflate NOME and, more importantly, would violate the terms of the contract.

In addition to tap-on fees, the County charges acreage, capacity, and availability fees. Unlike tap-on fees, there is evidence that these three fees do not directly reimburse the County for any specific expenses incurred by the County. If these fees do not represent "expenses which are reimbursed by special fees," they should have no effect on NOME. Nevertheless, the district court ruled that the amount of <u>revenue</u> recovered by these fees should be <u>subtracted</u> from NOME. NOME, however, is a calculation of <u>expenses</u>, not <u>revenues</u>. Based on the contract, not even tap-on fees are actually <u>subtracted</u> from NOME; rather, the corresponding expenses reimbursed by the tap-on fees are <u>excluded</u> from NOME. Requiring the County to subtract its revenues from the acreage, capacity, and availability fees improperly reduces NOME and thus affects the

32

determination of whether the County may charge ADM the higher NOME rate in section 5(f).  Accordingly, the district court erred by requiring, as a matter of law, the subtraction of these fees from NOME.[4]

The majority ignores the unambiguous language of the contract and instead purports to decide the case, as a matter of law, based on the parties' so-called course of performance.  North Carolina law provides that when a contract governed by the commercial code "involves repeated occasions for performance by either party <u>with knowledge of the nature of the performance</u> and opportunity for objection to it by the other, any course of performance <u>accepted or acquiesced in without objection</u> shall be relevant to determine the meaning of the agreement."  N.C. GEN. STAT. § 25-2-208(1) (emphasis added).  ADM did not know the "nature of the [County's] performance"  (<u>i.e.</u>, how the County calculated the water rate) until it first disputed the County's new water rate in 1999.  After ADM disputed the rate, the County provided copies of its internal worksheets.  Upon receiving the County's internal calculations, ADM did not "accept" or "acquiesce" in the County's calculation.  Instead, ADM informed the County that the information "still does not satisfy ADM that the new rate is in compliance with the terms

_____

[4]At oral argument, counsel for ADM conceded that availability fees do not directly reimburse any specific expenses. Counsel for ADM also conceded that the County's argument relating to acreage and capacity fees has merit.

of the contract," and, most tellingly, ADM refused to pay the increased rate imposed by the County. Thus, there is no course of performance between the parties, as defined by § 25-2-208, that is "relevant to determine the meaning of the agreement" in this case. Id.

The district court's misplaced reliance on course of performance necessarily affects the determination of the maximum rate the County is allowed to charge ADM under the express terms of the contract. Accordingly, I would reverse the grant of summary judgment in favor of ADM.

Even if I were to agree that the parties' course of performance qualifies as relevant evidence to help determine the meaning of the agreement, I would reverse summary judgment and remand for trial. Instead of treating the parties' so-called course of performance as relevant evidence, the district court and the majority essentially replace the parties' written agreement with what they consider to be the parties undisputed course of performance. This purported course of performance is, however, disputed at its very core. The County's evidence shows that the internal worksheets, which the district court and now the majority basically treat as the new contract, were not used to calculate ADM's rate. Instead of viewing this evidence in the light most favorable to the County, which we must do in our summary judgment review, the majority does its own weighing of the evidence and

34

rejects it as unbelievable.[5]  A jury, rather than the majority, should be allowed to decide which evidence to believe.

Finally, the majority fails to consistently apply what it deems to be the parties' so-called pre-litigation course of performance.  In the worksheets, which the majority views as sacrosanct for all other purposes, the County included depreciation in NOME.  To be consistent, the majority would necessarily have to conclude that this too was part of the parties' course of performance.  Nevertheless, the majority insists that depreciation cannot be included in this calculation because the express terms of the contract prohibit the County from doing so.  This conclusion by the majority is internally inconsistent with its view of the parties so-called course of performance, and it is also an incorrect ruling based on the evidence in the record.[6]

---

[5]The majority finds "it difficult to believe that any reasonable jury would" believe the County's denial that the worksheets were used to set ADM's rate.  The majority's prediction on what a jury might do with this evidence might be correct, but that question is for the jury to decide.

[6]At the very least, there is a question of fact whether depreciation can be included in NOME.  The express terms of the contract allow the County to include capital maintenance and operation expenses in NOME.  The County's expert opined that depreciation can be an appropriate way to estimate capital maintenance and operation expenses.  We must credit this testimony in our review of a grant of summary judgment.